IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HEALTH MATCHING ACCOUNT SERVICES, INC.,<br>PET HEALTH MATCHING SERVICES, INC.,<br>REGINA GOROG a/k/a REGINA BARGANIER, and ELLIOTT GOROG,<br><br>Defendants. | Case No. 4:25-00814-CV-W-RK |

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff, United States of America, through its attorneys, R. Matthew Price, United States Attorney for the Western District of Missouri, Leigh Farmakidis, Assistant United States Attorney, and Sarah Edwards and Allison McGuire, Trial Attorneys, United States Department of Justice, Criminal Division, Fraud Section, brings this action against Defendants Health Matching Account Services, Inc. ("HMA"), Pet Health Matching Account Services, Inc. ("PHMA"), Regina Gorog AKA Regina Barganier ("REGINA"), and Elliott Gorog ("ELLIOTT") (collectively, "Defendants") and alleges as follows:

### INTRODUCTION

1. REGINA, ELLIOTT, and others, doing business through HMA and PHMA, are engaged in an ongoing scheme to collect and confiscate monthly contributions from over 9,000 victims into a fraudulent health savings account-like product, using false marketing materials—advertising matching funds that were not actually available—and falsely representing available

account balances to induce the victims to continue to contribute to their accounts and to attract new victims, in violation of 18 U.S.C. §§ 1343 and 1349 (wire fraud and conspiracy to commit wire fraud). The evidence collected establishes probable cause to believe that the "health matching accounts" are a Ponzi scheme and that the funds that were represented to be available to members (or their pets) for certain qualifying medical expenses were not available—in fact, the collective member accounts did not contain nearly the amount of funds represented.

## CAUSES OF ACTION

2. The United States brings this civil action for injunctive relief pursuant to the Anti-Fraud Injunction Act, 18 U.S.C. § 1345, based upon predicate violations of wire fraud and conspiracy to commit wire fraud.

3. The United States has probable cause to believe that the commission of wire fraud, as defined by 18 U.S.C. § 1343, and conspiracy to commit wire fraud, as defined by 18 U.S.C. § 1349, occurred and will occur in the future absent relief pursuant to 18 U.S.C. § 1345.

## JURISDICTION

4. This Court has jurisdiction of this action pursuant to 18 U.S.C. § 1345, 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants have solicited customers in furtherance of the alleged fraudulent scheme in this district.

## PARTIES

6. HMA is a U.S. corporation that specializes in a health savings account-like product. Don Levit and REGINA founded HMA in or around 2015; HMA is headquartered in Houston, Texas. REGINA, ELLIOTT, and Individual 1 are all authorized signatories on the HMA bank account to which members sent their contributions, a PlainsCapital Bank account ending in x8956.

7.     PHMA is a U.S. corporation that specializes in a pet insurance-like product, similar to the HMA product for people. PHMA is also headquartered in Houston, Texas. REGINA is the sole authorized signatory on the PHMA bank account to which members sent their contributions, a PlainsCapital Bank account ending in x7102.

8.     REGINA is a Texas resident and president of HMA. REGINA holds final approval authority on HMA's claims approval and denial and manages HMA's and PHMA's financial accounts.

9.     ELLIOTT is a Texas resident and son of REGINA. ELLIOTT is responsible for sales and marketing of HMA and PHMA's products.

## HMA AND PHMA

10.    Don Levit founded HMA in or around 2015 with REGINA.

11.    HMA and PHMA induce people to become members by promising that if the prospective member opened an account, they could more than double their money in less than three years. Members select the "product" in which they wished to invest, with each product being named for the capped amount of funds that the member could reach in their account. For example, the "HMA 10,000" is the HMA product in which a member would make a monthly contribution of $140 (plus a monthly maintenance fee), and if the member did not use any of the funds for medical expenses, then, after 35 months, the member would have contributed $4,900. During that same time, HMA would have contributed "matching" funds of $5,100, and, in total, the member's account would have $10,000 available to the member for eligible medical expenses.

12.    Once the $10,000 cap is reached, the member pays only the monthly maintenance fee to maintain his/her account and ceases making the monthly contribution. If a portion of a member's HMA account is used for a medical expense, the member would then resume making

3

the monthly contribution (along with the maintenance fee) until the $10,000 cap is reached again—and HMA would again provide matching funds toward the cap while the member makes contributions.

13. The HMA "matching" funds are not provided as an equal amount each month. Instead, the matching funds accumulate at a greater rate toward the end of the 35-month contribution period. Put another way, HMA provides more matching funds when members have higher account balances. Thus, as set forth in the HMA Account Value Tables in HMA member contracts (excerpt below), after twelve months of contributions, a member who enrolled in the HMA 10,000 would have contributed $1,680, and the total account balance would be $1,980, meaning that HMA's matching contributions in the first year equaled $300. At the end of twenty-four months, the member would have contributed $3,360, and the total account balance would be $5,400, meaning that HMA's matching contributions in the second year equal $1,740. And at the end of thirty-five months, the member would have contributed $4,900, and the total account balance would be $10,000, meaning that HMA's matching contributions in the third year equal $3,060. Members are therefore incentivized not to utilize their HMA accounts until they have reached the cap to take full advantage of the matching funds.

14. According to HMA contracts—which clearly stated multiple times in bold font that HMA was not health insurance—HMA's eligible medical expenses are broad, encompassing services and equipment not traditionally covered by medical insurance such as cosmetic surgeries, procedures, orthodontics, marriage counseling, and eyeglasses.

15. If, however, an HMA member ceases contributing to his/her account or terminates his/her contract with HMA, the member would no longer have use of the funds in his/her HMA

account for medical expenses and the funds would not be returned to the member. Instead, under the contract, the account balance is forfeited to HMA.

16. HMA sells its non-insurance investment product through independent insurance brokers and provides the brokers with materials, including a "Brokers Quick Start Training Manual," which give instructions on selling the product. Specifically, the manual instructs brokers to emphasize HMA's "Medical Benefit Growth Ladder" and to explain to potential clients that the HMA matching of medical benefits is guaranteed and how the matching leads to $2 for every $1 contributed over 35 months.

## THE FRAUDULENT SCHEME

17. HMA and PHMA fraudulently induce victims to invest in a purported health savings account-like product, when in reality, it is a fraudulent Ponzi investment scheme.

18. A Ponzi scheme is an investment fraud that pays existing investors with funds collected from new investors. Ponzi scheme organizers often promise to invest investors' money and generate high returns with little or no risk. But in many Ponzi schemes, the fraudsters do not invest the money. Instead, they use it to pay those who invested earlier and take some for themselves. With insufficient legitimate earnings, Ponzi schemes require a constant flow of new money to survive. When it becomes hard to recruit new investors or when large numbers of existing investors cash out, these schemes tend to collapse.

19. Consistent with this type of scheme, HMA and PHMA recruit members with attractive terms, including the promise of matching funds and broadly defined eligible services. And, as alleged in more detail below, a review of HMA's and PHMA's bank accounts showed that by the fall of 2023, HMA and PHMA had only a tiny fraction of the amount purportedly in their members' accounts available and would not have been able to cover claims if even 1% of their members' account balances were needed for eligible medical expenses.

5

20. In October 2023, HMA changed its method for processing claims. This change gave HMA the ability to deny or delay payment of claims. HMA also prioritized payment of claims made by clients who were also insurance brokers, as well as clients who were signed up by HMA's most valued insurance brokers so that the brokers would continue to bring in new paying members. HMA would also partially pay claims—for example, paying $750 of a medical provider's $1500 bill—but the HMA customer's account balance would be decreased by the full $1500. In 2024 and 2025, including after HMA was named as the defendant in a class-action civil lawsuit, HMA continued to change the terms of its products, to deny claims that appeared to be eligible or reimburse them at less than the full amount, and to recruit new HMA members.

**Victim 1**

21. In January 2023, Victim 1, who lived in the Western District of Missouri at the time, signed up for an HMA account on the recommendation of his insurance broker. Victim 1 understood that HMA customers signed a 35-month contract that required the customer to make monthly contributions plus a maintenance fee that HMA kept as a fee for the service of providing medical benefits. Over the 35-month time period, Victim 1 understood that HMA contributed matching funds to the customer's account, with the matching level accelerating toward the end of that time period. According to Victim 1's contract, Victim 1 was to contribute $203 per month, which included a $53 monthly maintenance fee to HMA. HMA would match Victim 1's contributions up to a point where the customer's contributions and HMA's contributions together reached the $15,000 cap for which this product—HMA 15,000—was named.

22. At any given time, Victim 1 understood that the HMA account balance, which included the customer's monthly contributions plus HMA's matched funds, could be used for eligible medical expenses. When Victim 1 initially enrolled in HMA in January 2023, HMA issued

him a "prepaid debit card" called the "HMA Medical Reimbursement Card" to pay for medical expenses at the time of service. Victim 1 found that the prepaid debit card worked as HMA promised, and Victim 1 used the debit card for covered medical expenses.

23. On October 10, 2023, HMA informed members via email that it was transitioning away from debit cards to an ID card that members would present at medical appointments. HMA members would then ask their medical provider to bill HMA's third-party administrator ("TPA") directly for their claims. HMA cited fraud and abuse of debit cards as the reason for the change to the new system.

24. After the transition away from the debit cards, Victim 1 discovered that many medical providers would not accept the HMA ID card, refusing to submit and process claims through the TPA because HMA was not a health insurance company. Furthermore, according to Victim 1, when providers researched HMA and found complaints against the company on the Better Business Bureau ("BBB") website, the medical providers stated that they wanted nothing to do with HMA.

25. After October 2023, Victim 1 consistently had problems obtaining payment for claims. Further, Victim 1 noticed his account balance would sometimes decrease by the amount of his submitted claim even when HMA had not paid his claim. Victim 1 knew from various online sources, including forums and the BBB website, that other HMA customers were experiencing similar issues. Victim 1 reported his concerns to his insurance broker, who stated that the broker shared Victim 1's concerns as the broker himself and his other clients were experiencing the same problems with HMA's new system.

26. Victim 1 contributed approximately $203 per month to HMA beginning in January 2023. As of November 22, 2024, Victim 1 had a purported balance of $3,800 as represented by

HMA with $1,800 in claims that had yet to be paid. If Victim 1 stopped contributing to his HMA account, he would forfeit his entire account balance, per Victim 1's contract with HMA.

**Victim 2**

27. Victim 2 was a company located in the Western District of Missouri that employed approximately 130 people. Victim 2 was introduced to HMA by its insurance broker. On or about August 1, 2020, Victim 2 enrolled in a Health Matching Reimbursement Account[1] with HMA on behalf of its employees who elected to use HMA as a part of their company benefits package; because Victim 2 also offered a traditional insurance plan, not all employees enrolled in HMA. Since August 2020, Victim 2 has contributed between $303 and $318 per month, per employee, for approximately 34 employees and their families, for a total monthly contribution of over $10,000.

28. As with Victim 1, Victim 2's employees initially received debit cards, which worked as advertised for about three years. When HMA switched from the debit card to a member ID card in October 2023, the employees found that most medical providers would not bill HMA because it was not an insurance company. The providers who did bill HMA experienced extensive delays in payment or were never paid at all, which resulted in Victim 2's employees being denied care or having bills sent to collection agencies. Victim 2 and several of its employees complained to HMA multiple times without resolution. Victim 2 has continued to experience problems with HMA and described a lack of communication. HMA began responding to Victim 2's

---

[1] "Health Matching Reimbursement Account" and "Health Matching Account" are both medical savings accounts that help cover out-of-pocket medical expenses, but the Health Matching Reimbursement Account is an employer-sponsored program that pre-funds employee claims, while Health Matching Account is a non-qualified, medical savings product designed to pay for medical expenses.

communications only after Victim 2 withheld a payment to HMA and made a complaint to the Texas Attorney General.

**Victim 3**

29. Victim 3 is an HMA member who resides in Florida. In 2025, Victim 3 submitted a medical bill for $1,500 to HMA. Victim 3 was aware that HMA would only pay 50% of the bill. HMA deposited $750 in Victim 3's provider's account on September 19, 2025. Victim 3's HMA account, however, reflects that Victim 3's $1500 claim was approved and processed. The HMA account does not reflect that only $750 of the $1500 bill was paid. Victim 3 is currently attempting to end his HMA membership.

**The TPA**

30. As previously alleged, in or around October 2023, HMA changed from a debit card-based system to an ID card-based system. As part of the new system, HMA retained the TPA to process claims submitted through the ID card system.

31. By the end of 2023, after processing HMA claims for less than three months, the TPA began to experience multiple problems with HMA, including HMA's failure to pay legitimate claims, significant delays in paying claims, and failure to pay the TPA for its services as a TPA.

32. As soon as HMA engaged the TPA, REGINA pushed the TPA to secure discounts on claims for HMA with the TPA's network of providers. Based on the TPA's relationships with the providers, some providers agreed to discounted rates for promptly paid claims. However, REGINA decided that HMA members' account balances would be reduced by the undiscounted amount of the claim, rather than the discounted amount. In these scenarios, HMA kept the difference between the initial full billed amount and the discounted amount that was actually paid

to the provider. In addition to retaining the value of the discount, HMA matched less money because of the lower available balances. HMA did not disclose this practice to its members.

33. Between approximately October 2023 and April 2024, when HMA terminated the HMA-TPA contract, the TPA made payments to providers on HMA's behalf, some of which has not been reimbursed, upon information and belief. On or about April 3, 2024, the TPA began arbitration with HMA.

## Financial Investigation

34. Financial records show that HMA member account balances were false insofar as HMA did not have sufficient funds available to cover the total available balance reported.

35. On October 1, 2023, according to that date's member eligibility file, which showed each member's account balance, HMA reported a total available balance of $33,034,560 among 8,537 active members' accounts, and PHMA reported a total available balance of $513,246 among 487 active members' accounts.

36. However, a review of HMA's bank account statements shows that on October 1, 2023, all seven of HMA's PlainsCapital Bank business accounts collectively had a total balance of $130,609.20. In the event all HMA members submitted claims for qualified medical expenses up to the value of their purported balances, HMA would not have had the ability to pay their claims. In fact, HMA had funds equaling less than 1% of the amount of its purported member balances available at that time. On October 1, 2023, all four of PHMA's PlainsCapital Bank business accounts collectively had a total balance of $17,025.66. Similarly, in the event all PHMA members had submitted claims for qualified pet expenses up to the value of their purported balances, PHMA would not have had the ability to pay their claims.

37. The pattern of HMA and PHMA representing that their members' account balances far exceeded the actual funds on hand is summarized in the table below:

| Date | HMA Total Bank Account Balance | HMA Members' Total Account Balance per Eligibility File | Total Active HMA Members per Eligibility File |
|---|---|---|---|
| 10/01/2023 | $130,609.20 | $33,034,560.42 | 8,537 |
| 11/22/2023 | $990,720.83 | $35,820,212.12 | 8,827 |
| 12/01/2023 | $1,104,326.34 | $36,278,020.49 | 9,028 |
| 1/01/2024 | $1,183,794.85 | $37,824,178.67 | 9,155 |
| 2/01/2024 | $1,401,769.18 | $38,882,625.83 | 9,390 |

| Date | PHMA Total Bank Account Balance | PHMA Members' Total Account Balance per Eligibility File | Total Active PHMA Members per Eligibility File |
|---|---|---|---|
| 10/01/2023 | $17,025.66 | $513,245.67 | 487 |
| 11/22/2023 | $68,797.93 | $588,664.15 | 587 |
| 12/01/2023 | $77,562.61 | $601,942.15 | 591 |
| 1/01/2024 | $82,837.70 | $646,365.74 | 602 |
| 2/01/2024 | $97,987.87 | $671,434.98 | 605 |

38. Likewise, on October 13, 2023, HMA generated a statement of balances for Victim 2. HMA reported a total balance of $373,894.92 for Victim 2's 37 participating employees. As explained above, HMA did not have funds equal to even the balances associated with this one corporate customer, Victim 2, at that time.

39. Notably, the discrepancy between reported available balances and actual cash on hand in October 2023 coincides with HMA's shift from debit cards in favor of the member ID card system, which gave HMA more control to deny or delay payment, regardless of the claims' legitimacy or whether payment was required under the terms of the contract. Further, by utilizing the TPA to front payment for claims on its behalf, HMA could delay payment from its own funds and perpetuate the scheme by buying itself additional time to recruit new members.

40. Financial records also reflect that REGINA and ELLIOT used a substantial amount of HMA funds for expenses that do not appear to have a business purpose, including leisure travel,

food and entertainment, and rent on a beachfront condominium that ELLIOTT and REGINA maintained for substantial personal use.

## Communications

41. ELLIOTT acknowledged in communications that HMA is a Ponzi scheme, and communications also reveal HMA's knowing false statements regarding payments and available funds.

42. In messages sent by ELLIOTT on December 9, 2023, and January 29, 2024, ELLIOTT wrote, "It's my Ponzi scheme I can do what I want lol we actually caught a Donzi scheme in loving memory of Don" and later referred to HMA as a "Donzi" scheme, a reference to its founder, Don Levit.

43. In a November 15, 2023 message, ELLIOTT referred to HMA as the "stickiest product known to man," apparently referring to the fact that HMA's contractual terms made it difficult for members to leave HMA even when their claims were denied or payment was delayed because terminating the contract would result in forfeiture of the funds in their HMA accounts. ELLIOTT then elaborated, "Our clients average account balance is between seven and $10,000 and every time they called they're very easy to be turned around always like what where are you going to go? Looks like we have to work this out together guys. Lol."

44. In a November 27, 2023 message, ELLIOTT expressed his understanding and lack of concern that HMA members' claims were not being paid, noting "People are starting [to] come at me with pitch forks wanting their bills paid lol."

45. In a January 12, 2024 message, ELLIOTT stated that he was lying to brokers about HMA's plans to bring back the debit cards when no such plans were in place.

46. In a February 16, 2024 message, ELLIOTT referred to HMA as a scam.

12

47. On March 17, 2025, ELLIOTT forwarded REGINA a message he received regarding an allegation that HMA told members that checks were "cut" when the checks were never sent. REGINA responded, "[c]ome see me please."

48. On July 26, 2024, HMA sent an email from customercare@healthmatchingaccounts.com and claimed to have sent check number 4941 to pay a $731.40 claim. Additionally, the member's HMA balance was reduced as if the claim had been paid on June 3, 2024.

49. On July 15, 2024, REGINA sent ELLIOTT check number 4941 from the HMA PlainsCapital Bank Account for an amount of $320 with the memo "prompt pay reimbursement."

50. On September 25, 2024, after additional follow up communications related to the member's claim referenced in paragraph 47, that member's $731.40 claim was paid with check number 7406.

51. This communication is consistent with other victim experiences. HMA would often report that a check was sent to pay a claim, when in fact it had not been sent. The checks would be sent several months later or not at all.

### HMA Member Complaints and Lawsuit

52. On November 22, 2024, a class action complaint for breach of contract was filed against HMA in the Southern District of Texas. *See Woodbright et al. v. Health Matching Account Services, Inc.*, 4:24-cv-04611-KPE. The complaint centers on the October 2023 switch from HMA debit cards to member ID cards and alleges that "HMA unilaterally and without providing additional consideration or opportunity for consumers to receive a refund of monies in their accounts, or any of their previously paid monthly maintenance fees, materially changed the rules," thereby forcing HMA members to either "(1) discontinue making monthly contributions and

13

paying monthly fees and lose all monies in their accounts; or (2) continue making monthly contributions and paying monthly fees for materially different and reduced services than they bargained for, in order to not lose all of the monies in their accounts."

53. As of March 21, 2025, HMA had a rating of "F" on the BBB website, the result of 122 complaints in the past three years. Complaints included that members made monthly contributions into their HMA accounts with the expectation that they would be able to use those funds for medical expenses but were later denied access to their savings.

### Defendants' Fraudulent Scheme is Ongoing

54. HMA continues to recruit new members promising, "up to $2 in medical matching or more for every $1 above and beyond what you contribute into your program on a monthly basis as the program progresses."[2]

55. In addition to REGINA and ELLIOT, HMA has approximately 16 current employees and leases an office in Houston, Texas that appears fully operational. Upon information and belief, HMA's bank accounts presently contain funds obtained from members, and members continue to make contributions.

### COUNT I
### 18 U.S.C. § 1345 – INJUNCTIONS AGAINST FRAUD

56. The United States re-alleges and incorporates here the allegations in paragraphs 1 through 55 of this Verified Complaint.

57. Defendants committed the acts alleged in this Verified Complaint knowing that they engage in, and enable, the fraudulent scheme described above.

---

[2] https://healthmatchingaccounts.com/what-is-the-health-matching-account/ (last accessed October 7, 2025).

58. Defendants have used and continue to use interstate wires to defraud the victims of the scheme described above.

59. Defendants are engaged in ongoing violations of the wire fraud statute, 18 U.S.C. § 1343, and conspiracy to commit wire fraud, 18 U.S.C. § 1349.

60. The United States is entitled to an order pursuant to 18 U.S.C. § 1345(a)(1) permanently enjoining Defendants, their agents, and others from continuing to perpetrate their fraudulent scheme.

61. There is good cause to believe that Defendants will transfer, remove, dissipate, and dispose of funds obtained as a result of violation of 18 U.S.C. § 1343 if not permanently restrained from doing so.

62. The United States is entitled to an order pursuant to 18 U.S.C. § 1345(b) enjoining Defendants and their agents from removing property obtained as a result of their fraudulent conduct, and restraining Defendant HMA's and PHMA's assets obtained as a result of the fraud.

## **DEMAND FOR RELIEF**

**THEREFORE**, the United States requests of the Court the following relief:

(a) an order restraining Defendants, their agents, officers, and employees, and all other persons or entities in active concert or participating with Defendants in their affairs from:

    i. continuing to perpetrate a fraudulent scheme involving HMA and/or PHMA by violating the wire fraud statute and conspiracy to commit wire fraud statute;

    ii. maintaining and doing business through the use of the domain healthmatchingaccounts.com and/or healthmatching.com;

    iii. using the domain "healthmatchingaccounts.com" and/or "healthmatching.com";

    iv. taking actions designed to interfere with any additional Court orders regarding this domain;

      v.      using wire communications to make any fraudulent representations relating to HMA and/or PHMA plans or to transmit any materials that contain false statements relating to HMA and/or PHMA plans;

      vi.      soliciting or enrolling new HMA and/or PHMA customers/members;

      vii.      destroying business records related to HMA and/or PHMA business, financial, or accounting operations;

      viii.      preventing or attempting to prevent communication by any current or former HMA or PHMA employees or agents to law enforcement, or influencing or attempting to influence the testimony of any current or former HMA or PHMA employees in relation to any official proceeding; and

      ix.      cashing any checks or depositing or processing any payments from HMA and/or PHMA members.

(b)      an order directing that GoDaddy.com and Verisign, Inc. shall take such steps as are necessary to prevent the public from accessing Defendants' "healthmatchingaccounts.com" and "healthmatching.com" websites, including by changing the Domain Name System record to remove any named server and leave it blank, and shall impose a registry lock on the "healthmatchingaccounts.com" and "healthmatching.com" domain names and lock any accounts associated with the registrant of the domain name to prevent any change, transfer, or deletion of such domain name or accounts without the previous authorization of this Court.

(c)      an order restraining Defendants, their agents, including financial and banking institutions, their officers, their employees, and all persons in active concert or participating with Defendants in their affairs, from:

      i.      accessing the following accounts, including but not limited to, accepting deposits, processing payments, depositing, transferring, withdrawing, pledging, encumbering, disposing of, or otherwise using funds in any of the following accounts:

      PlainsCapital Account No. ****8956

      PlainsCapital Account No. ****9102

PlainsCapital Account No. ****8901

PlainsCapital Account No. ****3400

PlainsCapital Account No. ****7802

PlainsCapital Account No. ****7102

PlainsCapital Account No. ****1703

PlainsCapital Account No. ****3302

PlainsCapital Account No. ****3902

Stripe Account ID: acct_****vejH

Stripe Account ID: acct_****rp2t

Stripe Account ID: acct_****UYzw

    ii.    establishing any new bank accounts without informing the government in advance;

    iii.    dissipating, transferring, selling, withdrawing, pledging, encumbering, disposing of, or otherwise using, any personal or business assets that were derived or obtained from HMA- and/or PHMA-related activities, or that are co-mingled with money or other assets derived or obtained from HMA- and/or PHMA-related activities;

    iv.    opening or attempting to open safe-deposit boxes and/or safes into which proceeds of HMA- and/or PHMA-related activities are deposited, transferred or placed;

destroying or otherwise discarding any records (including electronically stored information), relating to the business of HMA and/or PHMA, including but not limited to business, corporate, banking, financial, and/or accounting records.

(d) an order requiring Defendants provide to the government, within ten (10) business days of notice of this preliminary injunction and order, a sworn statement setting forth:

    i.    The identification of each account or asset titled in the name of any named Defendants;

    ii.    The balance of each account or a description of the nature and value of each asset under the name of any named Defendants; and

17

iii. The identification of any safe deposit box or storage facility that is either titled in the name of or subject to access by any named Defendant.

(e) that the Court issue a permanent injunction on the same basis and to the same effect.

(f) such other and further temporary, preliminary and permanent relief as is warranted to prevent injury to the public.

R. MATTHEW PRICE

United States Attorney

By: */s/ Sarah Edwards*
Sarah Edwards
Allison McGuire
Trial Attorneys
Fraud Section
sarah.edwards@usdoj.gov
(202) 913-4782

*/s/ Leigh Farmakidis*
Leigh Farmakidis
Assistant United States Attorney
Charles Evans Whittaker Courthouse
400 East 9th Street, Room 5510
Kansas City, Missouri 64106
Leigh.Farmakidis@usdoj.gov
(816) 426-3122

## VERIFICATION

I, Special Agent Savannah Latta, hereby verify and declare under penalty of perjury that I am a Special Agent of the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint *in Rem* and know the contents thereof, and that the factual matters contained in paragraphs 1 through 55 of the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief, and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of the Federal Bureau of Investigation.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: 10/16/25

SAVANNAH LATTA
Digitally signed by SAVANNAH LATTA
Date: 2025.10.16 14:55:12 -05'00'

Savannah Latta
Special Agent
Federal Bureau of Investigation